# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| JVC AMERICA, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:05-CV-0681-JOF |
| GUARDSMARK, L.L.C., formerly | : | |
| known as Guardsmark, Inc., and | : | |
| MONIQUE WILSON, | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

This matter is before the court on Defendant's motion to dismiss for failure to join necessary parties [14-1]; Defendant's motion for summary judgment [33-1]; Plaintiff's motion to strike [45-1]; Plaintiff's motion for leave to file amended complaint [47-1]; Defendant's motion to correct [50-1]; Defendant's second motion for summary judgment [51-1]; Defendant's motion for leave to file excess pages [53-1]; Plaintiff's motion for leave to file supplemental brief [56-1]; Defendant's motion to strike [58-1]; Defendant's second motion to strike [68-1]; Defendant's motion to quash subpoena of American Home Assurance Company [80-1]; Defendant's motion to supplement motion to quash [91-1]; and American Home Assurance Company's motion to quash deposition subpoena [92-1].

## I.      Background

Plaintiff JVC America, Inc., sued Defendants Guardsmark, LLC, and Monique Wilson on March 11, 2005, alleging that Monique Wilson, a security guard provided by Guardsmark to JVC, conspired with Ketta "Dre" Woodard, an employee of Adecco Employment Services contracted to work for JVC, to steal products from JVC, in particular an Electronic Arts NCAA 2005 football video disc.[1]    JVC manufactures and produces CD-ROM discs for computer gaming and software companies, including Microsoft, Electronic Arts, and Adobe. JVC hired Guardsmark to provide security services for its Kennesaw, Georgia packaging facility.    As a result of the theft, Plaintiff avers that Electronic Arts suspended its production contract with JVC.    Although the contract was later partially reinstated, Electronic Arts still has not permitted JVC to produce its Madden Football products line.    JVC alleges negligence in the hiring and supervising of Wilson, breach of fiduciary duty, conversion, intentional interference with business and contractual relations, fraud, fraudulent suppression, and breach of contract.

Guardsmark filed its first motion for summary judgment on January 24, 2006, contending *inter alia* that it could not be liable to JVC for lost profits, consequential damages, or incidental damages because the contract between the parties contained an

_____

[1]Plaintiff has attempted to serve Defendant Wilson with process but has been unsuccessful.  *See* Affidavits of Anthonio Hightower and Peter Orlins filed with the court on December 28, 2005.

2

exculpatory clause which precluded the availability of such damages.  In responding to this motion, JVC sought a continuance under Rule 56(f) so that it could take the deposition of Ron Byrd, the former Human Resources Manager for Guardsmark's Georgia office.  The court granted this continuance.[2]   In response to Guardsmark's assertions concerning the enforceability of the exculpatory clause on the contract, Plaintiff also filed a motion to amend its complaint to drop causes of action of breach of fiduciary duty and conspiracy and to add an alternative cause of action of fraudulent inducement to enter the contract, as well as elevating its previous negligence allegations to "gross negligence" in hiring, supervising, and retaining.  The court addresses this motion below.

## II.     Discussion

### A.     Motion to Dismiss

Defendant Guardsmark contends that Woodard and Addeco, as his employer, have an interest in the outcome of this litigation and therefore should have been joined as necessary

---

[2]On February 24, 2006, Plaintiff filed a motion to strike because Plaintiff had electronically filed the incorrect brief in attachment with the motion.  Because the court granted Plaintiff's motion for a continuance, the court DENIES AS MOOT Plaintiff's motion to strike [45-1].

On March 7, 2006, Guardsmark filed a motion to correct or excuse non-compliance with the local rules.  In that motion, Guardsmark explained that it discovered it had not been using the proper font size in its submissions and requested permission either to replace the offending pleadings or to have the court accept them as is.  The court appreciates Guardsmark's candor, expects future compliance with the Local Rules, and determines that there is no need to refile the offending pleadings.  Accordingly, the court GRANTS Defendant's motion to excuse non-compliance [50-1].

parties pursuant to Federal Rule of Civil Procedure 19.   Defendant further avers that complete relief cannot be granted without the presence of these nonparties.

Rule 19 provides a "two-part test for determining whether an action should proceed in a nonparty's absence."   *City of Marietta v. CSX Transportation, Inc.*, 196 F.3d 1300, 1305 (11th Cir. 1999).   "The first question is whether complete relief can be afforded in the present procedural posture, or whether a nonparty's absence will impede either the nonparty's protection of an interest at stake or subject parties to a risk of inconsistent obligations."   *Id.* (citing Fed. R. Civ. P. 19(a)(1)-(2)).   If this threshold question is answered in the affirmative, "and if the nonparty cannot be joined (say for jurisdictional reasons)," the court proceeds to the second step in the analysis and considers whether in "equity and good conscience" the action should proceed among the parties before it, or should be dismissed.   *Id.* (citing Fed. R. Civ. P. 19(b)).   This analysis should not be formalistic, but rather based on "flexible practicality."   *Id.* (citing *Provident Tradesmen's Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118-19 (1968)).   The burden is on the movant to show that an absent part is necessary and indispensable such that the suit should be dismissed under Rule 19.   *See Nottingham v. General American Communications Corp.*, 811 F.2d 873, 880 (5th Cir. 1987).

Here, Plaintiff alleges that Guardsmark's employee, Monique Wilson, did not activate her electronic scanning wand before scanning Woodard as he left the manufacturing facility so that Woodard could remove the disc without being detected.   Under these circumstances, it would be possible for JVC to obtain complete relief by demonstrating the allegations in its

4

complaint against Guardsmark's employee, Wilson. While Addeco, who placed Woodard at the JVC facility, and Woodard may have played a role in this act, the fact that JVC **could** sue these two individuals does not make them "necessary" as defined by Rule 19 because Rule 19 does not require that all tortfeasors be joined in one action. *See Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit. . . . The Advisory Committee Notes to Rule 19(a) explicitly state that a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability."). Further, Defendant Guardsmark has not asserted that it would be subject to "a substantial risk of incurring double, multiple, or otherwise inconsistent obligations" were the action to proceed as it is. *See* Rule 19(a)(2)(ii).

The court finds *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999), cited by Defendant, to be distinguishable. There, Laker Airways sued British Airways contending that British Airways had conspired to monopolize landing slots at British airports. The Eleventh Circuit found that Airport Coordination Ltd., the corporation appointed by the British government to allocate slots, was a necessary party because it is the only entity that had the legal authority actually to award slots. Further, the court considered the national sovereignty implications of any suit concerning airport slots in holding that Airport Coordination Ltd.'s interest was more "significant than those of a routine joint tortfeasor."

5

*Id.* at 848.   Defendant Guardsmark has not made any allegations here which elevate Addeco and Woodard from position as routine joint tortfeasors.

Because Addeco and Woodard are not necessary parties, the court need not consider whether they are indispensable and DENIES Defendant's motion to dismiss for failure to join necessary parties [14-1].[3]

**B.      Motion to Amend Complaint**

As the court explained in the procedural history of the case, prior to the close of discovery, Defendant filed its first motion for summary judgment contending that as a matter of law, Plaintiff was not entitled to lost profits, consequential, or incidental damages because those damages were barred under an exculpatory clause in the parties' contract.   Plaintiff responds that (1) the exculpatory clause could not be enforced because it was not sufficiently prominent in the contract; (2) even if the clause was displayed appropriately, it would not apply to these circumstances because Defendant acted in a grossly negligent manner; and (3)

---

[3]At the conclusion of its reply brief, Guardsmark states in the alternative that the court should grant it relief under Rule 14.   *See* Reply, at unnumbered 5.   Rule 14(a) governs the impleading of a third party who may be liable to the plaintiff and permits a defendant, upon leave of the court, to act as a third-party plaintiff and file a complaint against a third party. Here, Guardsmark would presumably be filing a complaint against two third-party defendants, Addeco and Woodard, for unspecified causes of action.   Due to the significant impact this would likely have on the litigation, the court finds that a one-sentence request in a reply brief is not a sufficient basis upon which to make a motion of this character.   Further, this court's local rules specify that the filing of a motion must be accompanied by a memorandum of law in support of that motion.   *See* LR 7.1A(1).

6

even if the clause could be enforced, it would not apply because the damages sought by Plaintiff are not encompassed within it.

To conform its pleadings to these arguments, Plaintiff seeks to amend its complaint to (1) drop the causes of action of breach of fiduciary duty and conspiracy, (2) add an alternative claim of fraudulent inducement to enter into the contract, and (3) amend its previous claims to allege "gross" negligence in hiring, supervising, and retaining employee. Defendant opposes Plaintiff's motion to amend arguing that it is untimely and that it would be futile because Plaintiff cannot show that Defendant, or its agents, proximately caused any damage to Plaintiff. Specifically, Defendant contends that Plaintiff has no admissible evidence to prove that Woodard, with the assistance of Wilson, removed the Electronic Arts NCAA disc from JVC's facility.

In *Foman v. Davis*, 371 U.S. 178 (1962), the Supreme Court held that leave to amend a complaint should be "freely given" in the absence of such factors as undue delay, bad faith or dilatory motive, or undue prejudice. *Id*. at 182; *see also* Fed. R. Civ. P. 15(a). The Court also noted, however, that leave is not warranted where the amendment would be futile. *Id*. The Eleventh Circuit has held that a "proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Galindo v. Ari Mut. Ins. Co.*, 203 F.3d 771, 777 n.10 (11th Cir. 2000) (citation omitted).

Obviously, Plaintiff's proposed amendment to drop causes of action does not raise any of these concerns. With regard to the timeliness of Plaintiff's motion, Defendant correctly

AO 72A
(Rev.8/82)

states that Plaintiff's proposed amendment was filed nine months after the deadline in the scheduling order for filing amendments.  Thus, under *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417 (11th Cir. 1998) (citing Fed. R. Civ. P. 16(b)), the proposed amendment would have to be for "good cause."  Here, Plaintiff avers that it was only through the discovery process that it learned that Guardsmark had knowledge of Wilson's criminal history and yet permitted her to continue to work at the JVC facility and also did not inform JVC of her background.  Based on this discovery, Plaintiff desires to argue that Defendant fraudulently induced it to sign the contract because at the time JVC retained Guardsmark, Guardsmark assured Plaintiff that it conducted thorough background screening of its employees.  Further, Plaintiff plans to contend that the exculpatory clause of the contract does not apply to these circumstances because Defendant's failure to take action after learning of Wilson's criminal history constitutes gross negligence.  The court finds that this information was, indeed, gleaned in discovery, and that Plaintiff has not been dilatory in bringing these amended causes of action soon after the deposition of Mr. Byrd was completed.

The court does not agree that Plaintiff's proposed amendment would be futile based on the causation argument.  The court recognizes that on summary judgment, Defendant contends that none of the evidence Plaintiff raises on this point is admissible.  However, the proposed amendment is to be judged on the standard for motions to dismiss.  Plaintiff has alleged that Wilson was responsible for the theft of the disc, and that is sufficient for the purpose of considering the motion to amend.  In pleadings surrounding the motions for

8

summary judgment, Defendant also contends that Plaintiff's fraudulent inducement claim fails because Plaintiff elected to sue on the contract.    Although the court allows Plaintiff's amended complaint, the court will address Defendant's arguments on their merits in conjunction with the consideration of motions for summary judgment below.

In light of the foregoing, the court GRANTS Plaintiff's motion to amend its complaint [47-1].

### C.    Exculpatory Clause

In its complaint, Plaintiff seeks:

> [d]amage to JVC's business reputation, lost profits in excess of one and a half million dollars ($1,500,000), and substantial expenses necessarily incurred by JVC to investigate and stop continued theft, loss of profits and damage to JVC's business reputation, such as the expense of JVC's investigation and undercover operations, associated attorneys' fees and expenses, and expenses incurred to address the concerns of JVC's major customer and to secure renewed business from the customer.

Cmplt., ¶ 33.    During discovery, Plaintiff's witnesses testified that the damages calculation was $3,485,413, including "total income lost" and "out-of-pocket expenses," arising from the investigation of the theft, the implementation of security upgrades at the manufacturing facility, and legal fees.

Defendant contends that the parties contracted to preclude the lost profit and consequential, incidental, and indirect damages sought by JVC.    Plaintiff responds that the damage limitation language in the contract was not displayed prominently and should not be

enforced.   Plaintiff also avers that the clause does not apply to situations of gross negligence.

> The August 26, 2002 contract between Guardsmark and JVC provides:
>
> INSURANCE AND LIMITATION OF LIABILITY.  . . .  In no event shall GUARDSMARK be liable for any consequential, incidental, exemplary, unforeseeable, indirect, punitive or special damages including, but not limited to, loss of use or loss of anticipated profits, whether or not GUARDSMARK had been advised or put on notice of the possibility of any of the foregoing.

Service Order, § 8(e).

In Georgia, exculpatory clauses can be valid and binding and are not void against public policy.  *See*, *e.g.*, *McFann v. Sky Warriors, Inc.*, 268 Ga. App. 750, 757 (2004).  However, "[b]ecause exculpatory clauses waive substantial rights, could amount to an accord and satisfaction of future claims and require a meeting of the minds on the subject matter, they must be 'explicit, prominent, clear and unambiguous.'"  *Parkside Center, Ltd. v. Chicagoland Vending, Inc.*, 250 Ga. App. 607, 611 (2001) (quoting *Department of Transportation v. Arapaho Construction*, 180 Ga. App. 341, 343 (1986)).  In *Parkside Center*, the exculpatory clause appeared in a paragraph of a lease which had no separate paragraph heading and typeface as small as the surrounding numbered paragraphs on the last page of a form lease under the heading of "Miscellaneous."  *Id.* at 611.  Under these circumstances, the court found that the paragraph "lack[ed] any indicia of prominence" and was unenforceable.  *Id.* at 612.

This exculpatory language in the Service Order contract at issue here appears on the reverse side of a two-page contract.   The reverse page is entitled, "Standard Terms and

10

Conditions" and contains twenty-six paragraphs of additional terms formatted in dual columns. The court observes the information on the reverse side is in extremely small print and single spaced. There is no bold typeface which might distinguish some terms and conditions from others. The exculpatory clause appears in subclause (e) of paragraph 8 which contains six separate subclauses, none of which is separately set off. Without difficulty, the court concludes that none of the language on the reverse side of the Service Order, including the exculpatory clause, is prominent, explicit, or clear.

The court does not find it relevant that the parties made one alteration to reverse side terms in paragraph 4 and initialed those changes. The law does not require that exculpatory clauses be the same as all other material; rather, it requires that they be prominent, explicit, clear, and unambiguous. The fact that the parties may have considered one portion of the reverse side material speaks nothing about whether the exculpatory clause is sufficiently prominent.

The court finds *Grace v. Golden*, 206 Ga. App. 416 (1992), cited by Defendant, to be distinguishable. There, the exculpatory language was within a deed to secure debt, a document only two pages long. The typeface of the land description as well as the exculpatory clause was "larger and bolder than that in the preprinted portions of the deed." *Id*. at 417-18. The party's attorney placed his signature adjacent to the provision. *Id.* at 418. Based on the foregoing, the court concluded that the drafters of the exculpatory clause had not attempted to "camouflage" it, and the court enforced the terms of the clause. *Id.*

11

For the foregoing reasons, the court holds that the exculpatory clause contained in paragraph 8(e) of the Service Order is not enforceable as a matter of law, and the court DENIES Defendant's motion for summary judgment [33-1] on this issue.  Because the court finds that the exculpatory clause is not enforceable, the court need not consider whether Plaintiff has sufficiently alleged Defendant's conduct constituted gross negligence or whether the damages claimed by Plaintiff fall into the category of damages described in the exculpatory clause.

### D.    Fraudulent Inducement

In its motion to amend complaint, Plaintiff added a cause of action for fraudulent inducement.  Plaintiff alleges that Defendant induced it to enter into the contract by assuring Plaintiff that Guardsmark carried insurance that would cover Plaintiff's damages for incidents such as third-party theft.  Plaintiff also alleges that Defendant assured Plaintiff that Guardsmark conducted rigorous criminal background checks, had a selective hiring process, and would not employ security guards with criminal records.  By the time this lawsuit occurred, Plaintiff had already terminated its contract with Guardsmark.  JVC premised its original complaint against Guardsmark on a breach of contract theory.  JVC asserts that it only learned through the discovery process that Guardsmark had not done an extensive background check of Wilson and further failed to inform JVC of her background once it had learned of her prior criminal conduct.  JVC then amended its complaint to include the alternative cause of action of fraudulent inducement.  Defendant argues, however, that because Plaintiff chose to

12

sue under a contract theory, it may not also carry a tort claim for fraudulent inducement because the Service Order contains a merger clause.

There is no dispute that the contract between the parties contains a merger clause. Paragraph 26 of the Service Order specifies:

> COMPLETE AGREEMENT, ETC.:  With respect to the subject matter hereof, this Agreement supersedes and cancels all prior or contemporaneous negotiations, understandings and agreements entered into between GUARDSMARK and Client and is the complete Agreement between the parties.  No other agreements, commitments or representations, oral or written, have been made by GUARDSMARK.

*Id.*, ¶ 26.

The court finds *Liberty v. Storage Trust Properties, L.P.*, 267 Ga. App. 905 (2004), to be instructive.  There, the plaintiff had contracted with a storage facility to park a trailer in its parking lot.  Prior to signing the lease, the plaintiff contended that the storage facility had made certain representations to him concerning the security at the facility, and these representations – which later proved to be false – induced him into signing the lease with the storage facility.  The plaintiff's trailer was stolen from the parking lot, and he sued the storage company asserting causes of action of breach of contract and fraud.  The trial judge granted summary judgment on the plaintiff's fraud claim because the contract contained a merger clause.  On appeal, the plaintiff alleged that the trial court had erred in this ruling because the plaintiff had promptly rescinded the contract thereby giving no effect to the merger clause.

The court of appeals reiterated that

13

> [i]n general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for breach; or (2) rescind the contract and sue in tort for fraud. Depending upon which of the two [courses of action] is ultimately pursued, the presence of a merger clause in the underlying contract may be determinative as to the successful outcome. If the defrauded party has not rescinded but has elected to affirm the contract, he is relegated to a recovery in contract and the merger clause will prevent his recovery. If, on the other hand, he does rescind the contract, the merger clause will not prevent his recovery under a tort theory.

*Id*. at 910 (quotations and citations omitted). A "merger clause prevents a recovery in contract because it operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement." *Id.* (quotations and citations omitted). Thus, "where a contract contains a merger clause, a party cannot assert [it] relied upon representations other than those contained in the contract." *Id.*

The court then considered whether the plaintiff had rescinded the contract.

> [W]here a party who is entitled to rescind a contract on ground of fraud or false representations, and who had full knowledge of the material circumstances on the case, freely and advisedly does anything which amounts to a recognition of the transaction, or acts in a manner inconsistent with a repudiation of the transaction, or acts in a manner inconsistent with a repudiation of the contract, such conduct amounts to acquiescence, and, though originally impeachable, the contract becomes unimpeachable in equity. If a party to a contract seeks to avoid it on the ground of fraud or mistake, he must, upon discovery of the facts, at once announce his purpose and adhere to it. Otherwise, he can not avoid or rescind such contract.

*Id.* at 910-11 (citing *Cotton v. Bank South*, 231 Ga. App. 812, 813-14 (1998)). One "who seeks the rescission of a contract on the ground of fraud must 'restore, or offer to restore, the consideration received, *as a condition precedent to bringing the action* . . . ." *Id.* at 911

14

(quotation and citation omitted).  The *Liberty* court found that by "seeking damages for breach of contract in his complaint, [the plaintiff] took action 'inconsistent with a repudiation of the transaction' and lost his right to rescind the contract."  *Id.* (quoting *Cotton*, 231 Ga. App. at 814-15); *see also Holloman v. D.R. Horton, Inc.*, 241 Ga. App. 141, 146-47 (1999) (holding waiver of right to rescind when original complaint affirmed the contract, even though amended complaint included claim for rescission).  Based upon the foregoing, the court finds that Plaintiff has waived its right to rescind the contract and thus its fraudulent inducement claim fails.

### E.  American Home Assurance Company Subpoena

In April 2006, Plaintiff issued a subpoena duces tecum and a deposition subpoena to American Home Assurance Company, the company which issues insurance coverage for Defendant Guardsmark.  Both Guardsmark and American Home Assurance Company filed motions to quash the subpoena.  During the course of briefing those motions, Plaintiff and American Home Assurance Company reached an agreement as to the documents that should be produced.  Plaintiff avers, however, that Guardsmark has not consented to stipulate as to the authenticity of those documents.  The court determines that because American Home Assurance Company and Plaintiff reached an agreement as to the production of documents, the motions to quash are moot.  Any issues related to authenticity could be considered by the court in the event those documents would be moved into evidence.  Therefore, the court DENIES AS MOOT Defendant's motion to quash subpoena on American Home Assurance

Company [80-1]; DENIES AS MOOT Defendant's motion to supplement motion to quash [91-1]; and DENIES AS MOOT American Home Assurance Company's motion to quash deposition subpoena [92-1].

16

F.        **Sufficiency of Causation Evidence**

As the court described above, in its complaint, Plaintiff seeks:

[d]amage to JVC's business reputation, lost profits in excess of one and a half million dollars ($1,500,000), and substantial expenses necessarily incurred by JVC to investigate and stop continued theft, loss of profits and damage to JVC's business reputation, such as the expense of JVC's investigation and undercover operations, associated attorneys' fees and expenses, and expenses incurred to address the concerns of JVC's major customer and to secure renewed business from the customer.

Cmplt., ¶ 33.    During discovery, Bradford Springer, JVC's Vice-President of Finance and Administration, testified that JVC lost $3,576,566, including $2,868,220 in "total lost income" and $617,195 in "out-of-pocket" expenses as a result of EA's suspension.    *See* Springer Depo., Exhs. 29, 30 & 37.    The out-of-pocket expenses arise from the investigation of the theft, the implementation of security upgrades at the manufacturing facility, and legal fees.

Defendant makes a twofold argument concerning the sufficiency of Plaintiff's causation evidence.    First, Defendant contends that Plaintiff cannot demonstrate that the theft of the one EA NCAA sports disc led to EA's suspension of JVC.    Second, Defendant argues that even if JVC was suspended based on the theft of the disc, Plaintiff has not adduced admissible evidence to show that Defendant's employee, Monique Wilson, assisted in removing the disc from JVC's facility and therefore was the proximate cause of JVC's damages.

17

Plaintiff presented the testimony of Anna Brown, EA's Director of Manufacturing Operations for North America, who stated that EA first learned of the risk that a theft of a disc occurred at the JVC Kennesaw facility at the end of June or early July 2004 when Ron Vangrov, of JVC, called her. *See* Brown Depo., at 29-30. EA was also called about an attempted sale of the NCAA disc at Gamestop prior to the release of the disc. *Id.* at 39. Ms. Brown informed JVC in early July that EA was suspending it from production because of the theft of the NCAA disc. *Id.* at 51. As part of the suspension, EA removed all NCAA products from the JVC facility and relocated them to other facilities for processing. *Id.* at 188-89. Ms. Brown stated that there was no other reason that EA suspended JVC. *Id.* at 51. "This was a suspension until we could get in there and audit and ensure we had compliance to our intellectual property process and procedures." *Id.* at 52. EA informed JVC of the changes JVC would have to make to its manufacturing processes in order to be reinstated. *Id.* In September 2004, EA determined that JVC was in compliance with the new protocol established by EA. *Id*. at 54. EA, however, has not reinstated JVC for the purposes of manufacturing any Madden football products, EA's "best-selling" game. *Id.* at 186-87. JVC previously had been used by EA to manufacture the Madden products, and Ms. Brown testified that JVC's loss of that product was "very significant." *Id.* EA remains "reluctant" to return the Madden football line to JVC's facilities. *Id.*

Steve Williams, JVC's Plant Manager, also testified that EA suspended JVC because of the theft of the NCAA disc. *See* Williams Depo., at 113. Ron Vangrov, JVC's Vice

18

President of Operations, provided similar testimony.  *See* Vangrov Depo., at 111-12, 116, and 128; *see also* Springer Depo., at 37-39.

The court finds that this testimony is sufficient evidence from which a jury could conclude that EA suspended JVC and has not completely reinstated JVC's manufacturing role as a result of the theft of the NCAA disc.

Defendant next argues that Plaintiff cannot succeed on its tort claims of negligence; wantonness; negligent hiring, supervision, and retention; wanton hiring, supervision, and retention; conversion; intentional interference with contractual relations; fraud; and fraudulent suppression; and its breach of contract claim because it cannot show that Guardsmark's employee, Monique Wilson, assisted in removing the disc from JVC premises and would be the proximate cause of JVC's damage.  A wrongful act is the proximate cause of an injury when the injury can be directly traced to the act, and the injury would not have resulted "but for" the act.  *See*, *e.g.*, *Parris v. Pledger Ins. Agency, Inc.*, 180 Ga. App. 437, 439 (1986). To satisfy its burden of production on the element of proximate cause, a plaintiff must introduce evidence that allows for the reasonable conclusion that it is more likely than not that a defendant's conduct was the cause of the injury.  *See*, *e.g.*, *Anneewakee, Inc. v. Hall*, 196 Ga. App. 365, 367 (1990).  When there is a mere possibility of causation or the jury would have to speculate, then the plaintiff has failed to meet his burden.  *Id.*

Plaintiff alleges that Wilson cooperated with Woodard in plotting the removal of the 2004 NCAA Sports CD-ROM from JVC's facility.   From there, Plaintiff avers, the disc

19

passed to Clay Duda, a friend of Woodard's.  Duda had previously worked with Justin Kelley at an establishment called Johnny's Barbeque.  Kelley and Caleb Kitchen attempted to sell the disc at a GameStop store on July 1, 2004.  Plaintiff cites a series of depositions and declarations to support this allegation.  Defendant responds that none of the evidence pointed to by Plaintiff is admissible, and therefore Plaintiff has no evidence from which a jury could conclude that Guardsmark's employee was involved in the theft of the disc out of which all of Plaintiff's damages claims arise.  As such, Defendant contends, Plaintiff cannot show that Defendant caused its damages.[4]

In *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999), the Eleventh Circuit reaffirmed the "general rule [] that inadmissible hearsay cannot be considered on a motion for summary judgment." *Id.* at 1322 (quotation and citation omitted).  However, a district court may "consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1323 (quotations and citations omitted).  In *Macuba*, the court rejected the offered testimony because it was (1) hearsay, (2) could not be admitted at trial under a hearsay exception, and (3) might possibly be used for impeachment at trial, but certainly could not be used as substantive evidence. *Id.* at 1325; *see also Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 783 (11th Cir. 2004).  The court will first review the evidence adduced by

---

[4]The court GRANTS Defendant's motion for leave to file excess pages [53-1] and GRANTS Plaintiff's motion for leave to file supplemental brief [56-1].

Plaintiff to show that Guardsmark's employee, Monique Wilson, assisted in the theft as alleged by JVC, and will then consider the admissibility of this evidence.

>   1.   Evidence

**Anthony Williams**

Anthony Williams is an employee at JVC who informed management in June 2004 that a guard on the second shift named Monique had assisted in the theft of a disc from the facility by turning off her wand when Woodard exited the building.   Anthony Williams testified in his deposition that Woodard came up to him and said that if he needed any products, Woodard could get them for him from what he had available at his house.   *See* Williams Depo., at 17. Anthony Williams reported this conversation to Steve Williams, a plant manager at JVC.   *Id.* at 20.   (Steve Williams and Anthony Williams are not related.)   In a second conversation, Woodard told Anthony Williams that he had a way of getting the discs out of the JVC facility. *Id.* at 18.   Woodard reported to Williams that he (Woodard) had a "young lady that worked second shift for the security company.   When he needs something, he goes through her.   She don't wand him out." *Id.* at 21.   The guard's name was Monique. *Id.* at 24.   Anthony Williams testified that he never personally witnessed Woodard remove anything from the facility. *Id.* at 22.[5]

---

[5]This information is also contained in a declaration made by Steve Williams and submitted in conjunction with Plaintiff's response to Defendant's motions for summary judgment.   Steve Williams testified that Anthony Williams had approached him and told him that Woodard told Anthony that Woodard could remove any product from the plant, including

### *C. Dane Kanazawa*

C. Dane Kanazawa is a Cobb County police detective who investigated the theft at the JVC facility. Based on the notes in his investigative file, Detective Kanazawa testified that he identified Ketta Woodard, Clay Duda, William Williams, Justin Kelley, Caleb Kitchens, and Monique Wilson as suspects in the theft. *See* Kanazawa Depo., at 41. He developed this list of suspects based on information given to him by people at JVC and Asset Protection, as well as his own independent conclusions. *Id.* at 41-42. (Asset Protection is the name of a security group JVC hired to place an undercover operative at the facility to see whether any additional information about the thefts could be discovered.) The names of Woodard, Duda, Kelley, Kitchens, Williams, and Wilson were identified to Kanazawa by Asset Protection. *Id.* at 43, 46. Kelley and Kitchens were arrested and Kelley pled guilty to theft by receiving while Kitchens entered a diversion program as it was his first offense. *Id.* at 50-51. Detective Kanazawa believed that Kitchens and Kelley were working with someone on the inside of JVC's facility because neither individual had direct access to the facility. *Id.* at 53. Kitchens

---

game CDs. *See* Steven Williams Decl., ¶ 25. Anthony agreed to go back to Woodard to ask him how he was getting discs out of the facility. *Id.*, ¶ 26. Anthony Williams reported back to Steven Williams that Woodard said he was working with a guard name Monique who would turn off her security wand when Woodard left the facility so that he could get discs out. *Id.*, ¶ 27. Anthony also reported that Woodard told him Woodard could get EA's NCAA 2005 football game before its release to the public. *Id.*, ¶ 28. Based on this information, JVC conducted an undercover sting using the services of Asset Protection Inc. *Id.*, ¶ 31. The Cobb County Police Department also conducted an investigation. *Id.*, ¶ 32. The undercover investigation included interviews with Monique Wilson and Keith Nichols, *id.*, ¶ 33, which Steven Williams attended.

and Kelley, however, never revealed who they were working with. *Id.* at 55. Kitchens told Detective Kanazawa that he had obtained the disc from dumpsters outside the facility, but Detective Kanazawa did not believe that story because the disc they tried to sell at GameStop was of too good quality to have spent time in a dumpster. *Id.* at 59. Detective Kanazawa did not issue arrest warrants for any of the other suspects because he did not believe he had enough evidence on them. *Id.* at 61. Detective Kanazawa showed up at the JVC facility on July 23, 2004, to interview employees. *Id.* at 67. Detective Kanazawa learned from other employees that they had seen Woodard on that day around the facility, but he did not come in to work. *Id.* at 67. The detective believed that Woodard had seen the police and decided to leave. *Id.* Detective Kanazawa attempted to find Woodard at his hotel room, but he had already checked out of the hotel and left no forwarding information. *Id.* at 68.

He interviewed Wilson on July 22, 2004. *Id.* at 76. She denied involvement in the theft, but Detective Kanazawa was uncomfortable with Wilson's demeanor during the interview. *Id.* at 77.

The detective also had a statement from Anthony Williams who stated that he heard that Woodard had some CDs for sale. Anthony Williams reported this to Steve Williams, a manager at JVC. Steve Williams asked Anthony to ask Woodard how he acquired the discs. Anthony told Woodard he wanted fifteen game CDs, and Woodard told him he could have anything because Woodard had a hook up with a second shift security supervisor named "Monica" and there were no problems. *Id.* at 83 & Exhibit 2.

23

*Asset Protection, Inc.*

Robert Larkin, Vice President of Asset Protection, Inc., gave a Rule 30(b)(6) deposition in which he testified that on July 6, 2004, an undercover operative observed Wilson wanding Woodard with a wand that did not appear to be on.  Larkin Depo., at 4.  Mr. Larkin also identified the undercover operative's reports.  Nechanta Alexander, the undercover operative, provided reports to JVC after she was assigned to train with Woodard.  On July 6 and 8, 2004, Woodard waited to exit the building until he could be wanded by Wilson.  The operative stated that she saw Wilson's wand was not activated when Wilson scanned Woodard.  The next two days, the operative saw Wilson and Woodard conversing at the JVC facility.  On July 17, 2004, Woodard informed the operative that he was able to get product out of the building with the help of security.  Ms. Alexander was deposed on February 8, 2006 and testified as to the facts related in her contemporaneous reports.[6]

      2.    <u>Admissibility</u>

---

[6]Plaintiff also points to the interview of Monique Wilson.  Ms. Wilson was interviewed on July 27, 2004, in the presence of Barry Frederick, who identified himself as a lawyer for JVC, Steve Williams, and D. Caroll Toohey.  *See* Interview Transcript, Steve Williams Decl., Exh A.  Ms. Wilson gave permission to tape the interview.  In the interview, Wilson stated that she knew Woodard.  *Id.* at 22.  She also stated it might be possible that she forgot to turn on the wand when she was scanning employees who were leaving.  *Id.* at 27.  Wilson also said that she knew an employee contended that she turned her wand off when Woodard came through to be scanned because the police officers came by to question her about it.  *Id.* at 28.  The court finds that there is nothing in the transcript of Ms. Wilson's interview which would tend to establish that she and Woodard engaged in a scheme to remove a disc from JVC.  As such, the court need not address the evidentiary issues concerning this transcript at this time.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and is generally not admissible unless is falls under an exception to the hearsay rule. Federal Rule of Evidence 805 states "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." *Id.*

The more significant portions of Plaintiff's evidence with respect to Monique Wilson's alleged involvement in the theft of the disc are statements made by Woodard to Anthony Williams and to Nechanta Alexander. Woodard allegedly informed both of these individuals that he could get product out of the JVC facility because he had the assistance of a female guard working at the facility. Although Mr. Williams and Ms. Alexander are available to testify, their reporting of Woodard's statement would still be hearsay under Rule 805 and therefore Woodard's statement, itself, must fall under some hearsay exception in order to be admissible.

Plaintiff contends that because Woodard is "unavailable" either through his complete absence or through an assumption that he would plead the Fifth Amendment were he to be called to the stand, Williams' reporting of his conversation with Woodard could come into evidence as a statement against interest under Federal Rule of Evidence 804(b)(3). Defendant disagrees, asserting that JVC merely speculates about what might happen at trial and has not demonstrated that Woodard is "unavailable." Defendant further contends that it is not clear

25

that Woodard would take the Fifth Amendment rather than testify because Woodard also gave a statement to JVC where he denied the accusations of theft.   Finally, Defendant argues that even if Woodard's statements satisfied the requirements of Rule 804(b)(3), the court should nonetheless exclude them under Rule 403 because they are prejudicial to Defendant.

> Under Federal Rule of Evidence 804(b)(3), a statement is admissible if it
>
> was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

*Id.*, 804(b)(3).   To come within Rule 804(b)(3), (1) the declarant must be unavailable, (2) the statement must so far tend to "subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true"; and (3) the statement is corroborated by circumstances indicating its trustworthiness.   *See United States v. Costa*, 31 F.3d 1073, 1077 (11th Cir. 1994).

A declarant is unavailable when he "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . or testimony [] by process or other reasonable means."   *See* Fed. R. Evid. 804(a)(5).   The proponent of the hearsay statement bears the burden of showing that the declarant is unavailable.   *See United States v. Acosta*, 769 F.2d 721, 723 (11th Cir. 1985).   Plaintiff has stated only that   "Woodard's whereabouts are currently unknown."   *See* Response, at 7.   The Eleventh Circuit has not explicitly addressed the "availability" of a witness under the circumstances presented in this

case.   The court did reject evidence under Rule 804(b)(3) where there was "no showing that the declarants were unavailable" and where the proponent made no effort to show the witness was unavailable.  *See Card v. Dugger*, 911 F.2d 1494, 1515 (11th Cir. 1990), and *United States v. Walker*, 59 F.3d 1196, 1199 (11th Cir. 1995).   Other cases reach similar results.  *See*, *e.g.*, *United States v. Abreu*, 342 F.3d 183 (2d Cir. 2003) (where defendant's son resided in the Dominican Republic, son was not "unavailable" where there was no evidence that defendant had "made any efforts or taken any steps to procure his son's attendance or testimony at trial"); *United States v. Draiman*, 784 F.2d 248, 258 (7th Cir. 1986) (where neither Government nor defendant knew where witness was at time of trial, court properly refused to admit testimony because proponent did not make showing that witness was "actually unavailable").  *Compare United States v. Ochoa*, 229 F.3d 631, 637-38 (7th Cir. 2000) (court declared witness unavailable where FBI spent several days trying to locate witness, speaking to his employer, landlord, and others, and obtaining a material witness warrant, all to no avail).

Here, neither Plaintiff nor Defendant knows whether Woodard is available or not. Woodard has not been deposed.  The court does not even know whether either party has actively pursued locating him.   The court is left to speculate whether Woodard might eventually be located.  Based on the information before the court, the court finds that Plaintiff has not met its burden of demonstrating that Woodard is unavailable.

In the alternative, Plaintiff contends that Woodard is unavailable because he would likely take the Fifth Amendment if called to the stand.  It is true that in the Eleventh Circuit

when a witness exercises his Fifth Amendment rights, he is unavailable for the purposes of Rule 804(b)(3). *See United States v. Jernigan*, 341 F.3d 1273, 127 (11th Cir. 2003) ("the first prong of the test is satisfied, as [witness] exercised his Fifth Amendment right not to testify at trial"); *United States v. Thomas*, 62 F.3d 1332, 1337 (11th Cir. 1995) ("Because they invoked their Fifth Amendment privilege to remain silent, it is clear that the McCoys were unavailable."). However, here again, the court is left only to speculate as to whether Woodard would plead the Fifth Amendment. While the court recognizes that the law does not require Woodard to be brought to the stand to invoke his privilege, some assertion of the right is required. The court has no indication from Woodard, or even his counsel, as to whether he would exercise such a right.

The court finds that *Macuba* was not intended to allow for the admission of evidence under these circumstances. Rather, as *Macuba* and *McMillan v. Johnson*, 88 F.3d 1573 (11th Cir. 1996), explain, these cases allow "otherwise admissible evidence to be submitted in an inadmissible form at the summary judgment stage, though at trial is must be submitted in admissible form." *Id.* at 1584. Thus, the court may consider the affidavit of a witness who was not deposed during discovery, but "a suggestion that admissible evidence might be found in the future is not enough to defeat a motion for summary judgment." *Id.* Because the court finds that Plaintiff has not demonstrated Woodard is unavailable, the court need not address whether the statements are against his penal or pecuniary interest or whether they are corroborated by other evidence.

28

In the alternative, Plaintiff contends that the statement of Mr. Williams and Ms. Alexander could come in through Detective Kanazawa's police report.   Federal Rule of Evidence 803(8) provides a hearsay exception for "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, [excluding criminal matters] or (C) in civil actions and proceedings . . ., factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." *Id.*   Because Rule 803(8)(C) relates to the admissibility of such evidence in civil – and not criminal – proceedings, Defendant's argument that such reports have not been admitted in criminal cases is distinguishable.

Reports of police officers conducting criminal investigations have been admitted into civil proceedings through Rule 803(8)(C).   *See, e.g., Combs v. Wilkinson*, 315 F.3d 548, 555-56 (6th Cir. 2002) (admitting investigative report under Rule 803(8) and rejecting argument that information not within author's personal knowledge because reports "embody result of investigation and accordingly are often not the product of the declarant's firsthand knowledge") (citation omitted); *Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir. 1994); *Foster v. General Motors Corp.*, 20 F.3d 838, 839 (8th Cir. 1994) (per curiam) (admitting under Rule 803(8) police report of investigating officer in civil suit concerning traffic accident);*United States v. Warren*, 42 F.3d 647, 657 (D.C. Cir. 1994) ("803(8)(C) appears

to provide for admission of police officers' statements in public records even in the absence of a demonstration that the statements reflected the officers' personal knowledge"). *But see Miller v. Field*, 35 F.3d 1088, 1092 (6th Cir. 1994) (holding investigative police reports containing summaries of interviews with witnesses, victim, and prosecutor, that contained "neither factual findings made by the report's preparers nor conclusions and opinions based upon such factual findings" inadmissible under Rule 803(8)(C)).

The Eleventh Circuit has not explicitly discussed this issue but assumed the admission of witness statements in *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299 (11th Cir. 1989). There, the Eleventh Circuit considered the admission of an OSHA investigation report into a civil wrongful death action. The report had been prepared by an OSHA investigator the day after a fatal accident at a construction site, and included his interviews with several people. *Id.* at 301. The crux of the matter in *Hines* was whether certain opinions and conclusions of the accident investigator were admissible under Rule 803(8)(C). Citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988), the court held that they were. Thus, the court finds that under Rule 803(8)(C), only the opinions and conclusions of Detective Kanazawa formed during his investigation are admissible. As to the statements of third persons given to Detective Kanazawa, the court finds persuasive the opinion in *Miller*, and the cases cited therein, which hold that a statement of a third party is not admissible merely because it is contained in a police report. Thus, Mr. Williams' and Ms. Alexander's statements concerning Woodard's words to them cannot be bootstrapped into evidence through Detective Kanazawa's police

30

report.   Detective Kanazawa could testify, however, as to his opinions and conclusions concerning Ms. Wilson.   He concluded that he probably could only have obtained a warrant for Woodard, but not for Monique Wilson.   *See* Kanazawa Depo., at 88; 89 ("I do not believe I had sufficient probable cause to get a warrant for Ms. Wilson.").   He testified that he did not feel good about his interview with Ms. Wilson and he did not believe she was being truthful. *Id.* at 76-77 (also indicating he was uncomfortable with her criminal history).

Furthermore, no party contends that Ms. Alexander's personal observations would be hearsay.   Therefore, she would be able to testify that she saw Monique Wilson "wand" Woodard out of the building while the wand was deactivated.   Defendant correctly notes that the undercover operative witnessed this "wanding" after the time the NCAA disc had been removed from the facility, and thus, the value of this observation in relation to the theft of the NCAA disc is slightly diminished.

The court finds that no reasonable jury could conclude – based on Ms. Alexander's "wanding" observations and Detective Kanazawa's conclusions concerning Ms. Wilson – that Ms. Wilson was involved in the chain of events that led to the theft of the NCAA sports disc. Thus, Plaintiff has no evidence to demonstrate that Ms. Wilson's actions caused the damages it suffered, and the court grants Defendant's motion for summary judgment on this basis.

31

The court notes that Defendant has filed two motions to strike testimony. The court specifically addressed the testimony related to the causation issue as it was necessary to resolve in the context of Defendant's summary judgment motions.    Accordingly, the court GRANTS IN PART AND DENIES IN PART   Defendant's motion to strike [58-1] and GRANTS IN PART AND DENIES IN PART  Defendant's second motion to strike [68-1].

## III.   Conclusion

The court DENIES Defendant's motion to dismiss for failure to join necessary parties [14-1]; DENIES Defendant's motion for summary judgment [33-1]; DENIES AS MOOT Plaintiff's motion to strike [45-1]; GRANTS Plaintiff's motion for leave to file amended complaint [47-1]; GRANTS Defendant's motion to correct [50-1]; GRANTS   Defendant's second motion for summary judgment [51-1]; GRANTS Defendant's motion for leave to file excess pages [53-1]; GRANTS Plaintiff's motion for leave to file supplemental brief [56-1]; GRANTS IN PART AND DENIES IN PART  Defendant's motion to strike [58-1];  GRANTS IN PART AND DENIES IN PART  Defendant's second motion to strike [68-1]; DENIES AS MOOT Defendant's motion to quash subpoena on American Home Assurance Company [80-1]; DENIES AS MOOT Defendant's motion to supplement motion to quash [91-1]; and DENIES AS MOOT American Home Assurance Company's motion to quash deposition subpoena [92-1].

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.

**IT IS SO ORDERED** this 22nd day of August 2006.


___s/ J. Owen Forrester___
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)